Alright, we'll bring up the next case. Alright, and I just want to say I'm very respectful of the fact that we want to have affordable medication for cancer and I'm also very respectful of the fact that people don't want to lose their hair forever. So I'm respectful of both sides at the core, but that we will take a look at the issues. Case number 23-30323, Hickey v. Hospira, et al. And we'll begin with Richmond Moore for Hospira. Good morning, may it please the court. Richmond Moore for Hospira, Inc. and Hospira Worldwide, LLC. Plaintiff state law failure to warn claims are preempted by federal law because it was impossible under federal regulations for Hospira to change its labeling to warn of permanent hair loss without prior FDA approval. But in the end, you did request the label warning and you got it. Correct. So the CBE process was available to you. It was used. It was used, but it was used on different information that we did not have access to at the time. That's, is that the, this is a fact case, whether there was clear error as to whether you had that evidence or do you think the district court's ruling has fact and legal errors? No, this is not a factual dispute, Your Honor. This is based on a pure legal error which the district court misinterpreted the applicable federal regulations.  It's based on Santa Fe's internal adverse event report data, not on information that was available to us spirit at the time. What the district court did was created a brand new regulation only as applied to 505B2 requirements that both ignore the text of the regulation. It disregarded the significance of the FDA approval and it misinterpreted the FDA's own explanation of this regulation. Am I right or wrong that the district court around page 26 said, well, regardless of the complicated questions implicated by pre-approval data, also studies post-approval show a heightened risk of permanent hair loss? The district court looked at information before approval and after approval. What the district court did not do is do a comparison between the two and find that it met the requirements of the CBE regulation. That's the heart of the case. That's what's required under the CBE regulation to show a risk of a different type or greater significance. It said I see a heightened risk based on post-approval studies. That sounds like that's what you're supposed to do to see if there's newly acquired information of a heightened risk, and it said that it did. But there was also a risk before approval. Yeah, you can't know if it's new unless you know what's old. Exactly. That's your point? That's exactly right. Before and after, do you accept the Fourth Circuit's Knight decision as the correct one, who's got the burden to produce before and after? Correct. We think that's right. That is right. So why wasn't that, why isn't that just a fact determination that she made the finding that the plaintiffs here did show post-approval after 2011, new evidence came to show a higher risk frequency? Well, because she didn't find that, respectfully, Your Honor. But it says she did at page 26. No, Your Honor. I can read it. Okay. Well, what she did, what she did was she said there was a risk after approval that showed a causal standard. She said there was a risk before approval that met the causal standard. What she did not do, it is nowhere in that opinion, a comparison between the two, nowhere in that opinion. Are you suggesting we vacate remand so the experts can give us what the numerator is and what the denominator is? I believe the correct approach should be, Your Honor. There's no factual dispute here. This is a misinterpretation of the regulation. The plaintiffs advanced a incorrect interpretation of the regulation. But you're saying, and they may agree, I'm just, this is obviously very, these preemption wars are extremely consequential. A lot of them end up in high estate courts. We're looking at post-Albrecht case law. Right. Now, we're not in a situation where anyone's doubting causation, because you all commendably did say, uh-oh, there is some higher risk. That's why we're warning. Correct? Correct. I mean, the data, we take issue with the data, but for purposes of this appeal, we're But the sentence of warning isn't exactly that. It just says this has happened. Correct. It doesn't say it's caused by the drug. It just says this does happen. That's right. Because at least at the time that was decided by the FDA, it wasn't clear to them that it was because of this drug. That's right. The FDA, when the FDA made the decision based on Sanofi's data, not our data, it said all that can be said here because of the confounding factors is that cases have been reported. But for purposes of this appeal, again, Which is a little bit different from cases have been caused. Correct. Correct. And so But if there is no caution, they don't add to a warning for the very reasons your brief said. You don't want to overwarn doctors and patients. That's right. It's like Goldilocks. They didn't just say, well, we're just going to do it whether there's causation or not. This is the rare case that I think scientific causation isn't implicated because you all and the FDA, everyone agreed we've now got to tell women primarily there's a risk of permanent hair loss. Everyone did it. But that's right. But that's after the relevant time period, Your Honor, because during the relevant time period, which for us was March 2011 until October 2013, when this plaintiff took the product. The question is, was there any new information in that time period that showed a risk of a different type or greater severity of frequency that had been previously reported? The FDA had that. Correct. When they approved it. That's right. And so your point is at the time y'all took it, it was already out there. But the FDA did not think it needed to be said, did not think it would be helpful. That's exactly right. But Wyeth is pretty crystal clear, disagree if I'm wrong, that the duty extends to reexamining earlier data. It's not this, oh, well, Americans get hurt because the FDA in its very limited resources just didn't notice this type of more severe circumstance. You're not saying there's a free pass just because they didn't see it in the original data. That's right. Well, that's correct. There can be accumulating data taken together that can form newly acquired information. But the court in Knight nailed it. It said, and I'll quote, it said, the rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent development. But the next sentence says, still, the new analysis must reveal risks of a different type of a greater severity of frequency to constitute newly acquired information. So if you take all the information that shows something new, that would be different. That's not here. There's nothing in the record that shows that. And I'm a little confused on what type of risk is this? Would you say it's a frequency risk, it's a severity risk, or it's a new type risk? Frequency. You think frequency? Correct. But in the original warning back in 1996, they just said baldness. They never said permanent baldness. That's right. It sounds like severity or new type. Well, no. The type is permanent hair loss. The severity. There was no warning ever of permanent hair loss. Right. But the point here is that permanent, well, permanent hair loss, no. But there were reports. It just said hair loss. It didn't say permanent or temporary. Right. It just said hair loss. Correct. That's right. Why is that frequency? Why isn't that severity? It sounds like a lot more severe if you're going to lose your hair forever. Well, let me be clear. Permanent hair loss is a risk of a different severity or type than hair loss. Okay. However, the question is, that's the risk at issue. Permanent hair loss. The question is, were there reports of permanent hair loss of a greater frequency than... Why isn't that the question? May we go a little longer? This is important. Do you mind if we have some time? Yeah. Although, you're going to have Ackard next. I know. Okay. Quickly. Yeah. This is a difficult issue for me. Originally, in 96, the FDA just says alopecia. Correct. That's the adverse effect. Correct. But if deep in those records, it turns out there was incidents of permanent alopecia, that means the generics can always point to that and say, we didn't have to warn, even though that data, so it was overlooked data by the FDA. It wasn't overlooked. It was carefully considered. How do we know that? Because in a 505B2 context, the 505B2, by design, doesn't have access to all of the information that the brand manufacturer has. That's the purpose of 505B2. So, Sanofi, the brand, submits all the clinical data, all the adverse events. That safety and efficacy data to get approved by Sanofi is not available publicly? Is that your position? No. Then it wasn't. That's right. Not at the time. But is it now in 2011? Did the generics have that? Well, we have information through the MDL. I thought I understood from the briefs, you don't have access to their adverse incidents. Correct. But I thought you do have access to the underlying safety and efficacy data. No. No. Okay. Not at the time. Because that's the whole purpose of the 505B2. Yeah. Your time is up, but you've saved some time for rebuttal. Thank you. And your fellow defendant is speaking next. So, we'll hear from Michael Ruttinger on behalf of Ackard Healthcare. Good morning, Your Honors. May it please the Court, Mike Ruttinger for Ackard Healthcare, Incorporated, representing Ackard as to the Adams, Woodson, and Cooper cases consolidated as part of this appeal. Your Honor, Judge Higginson, when you asked my colleague, Mr. Moore, about is this a fact case or a law case, it's a law case. And the reason it is a law case is because when the district court certified this case for an interlocutory appeal, the court expressed the need for guidance as to how the newly acquired information regulation applies in the context of a 505B2. This court will be issuing the first decision of any federal court explaining how that regulation applies to a 505B2. One thing I'm wondering is, because you have the 505J where they just completely do exactly what the prior company did, and they follow that exactly. So, that's kind of easy. This one's a little different because you all change it a little. And what I'm wondering is if what the district court was focused on really is if your change is what is causing the problem. You need to get that out. As opposed to you're simply in the same bucket as everybody else that has started giving this medicine. Your Honor, yes. And the reason why is because if this court applies the interpretation of newly acquired information that we believe it should, then that is exactly how the regulatory system works and exactly the reason that Congress designed it to work in that way. Now, the answer to the guidance we believe this court should provide to the district court, and I think that this addresses many of the questions Judge Higginson asked earlier, is to create a rule that says in the 505B2 context, the newly acquired information means information acquired by a 505B2 manufacturer after the date of its approval that reveals a risk of a different type, greater severity, or frequency than reflected in the publicly available scientific and medical literature at the time of that 505B2's approval. That is, that 505B2's date of approval creates the baseline from which the court should apply the data. Your Honor, that would be 2011. That's the before and after. June 2011 for Accord's docetaxel product, yes, Your Honor. Am I wrong that the district court said in the alternative, and this is around page 26, I also think the studies do show the reanalysis of the underlying data, the frequency is higher? To ask, Your Honor, just to clarify, the district court made two observations in the literature. One was about the preapproval literature. Are you talking about the preapproval literature? I'm talking about the postapproval. I think I understand. I'm comparing the two. So the short answer is under the interpretation of the regulation we believe the court should have applied, the court did not apply that, because the district court basically got hung up on what do you do with a right of reference issue, Mr. Moore said. What do you do with the fact that a 505B2, and this is undisputed, does not have access to the clinical trial data on which Sanofi initially had the Hexatier product approved? And so the court said, well, if there's no numerator to that equation, if I can't do a direct comparison because I don't know what the 505B2s knew at that time, can I just say, well, there is some risk postapproval, and that's enough to cause duty to revise the label? The answer to that, we believe, is that no. Because while there may be risk information in postapproval literature, under the text of the regulation, it is not necessarily of a greater severity or frequency or a different type than of the information that the 505B2. And you all were not notified of people using your drugs that they were losing their hair permanently? With respect to Accord, correct. During the relevant time periods, Accord received no adverse event But what I'm trying to understand, so let me just give a hypo. Let's say the drug was well known to be giving people headaches, but maybe the terrible headache wasn't listed, but just a light headache or something. And there were still terrible headaches. But let's say that the alteration made by X, who takes over the drug, now causes people, now more people are dying. So it's not just getting a headache, they're dying. That is something they better tell everyone because no other version of this drug is having people die, but theirs is. So they better get out there and tell them. But that's different from the headache. Is that making any sense? I realize that's a hypo, but... Yes, Your Honor. And it's exactly how the system should work. So take, for example, Accord's docetaxel. It varies from Taxotere in only two ways. The use of citric acid and polyethylene glycol as an active ingredient. Suppose for a moment, and I think this is the same hypothetical that Your Honor is giving, but with the actual facts of this case, that Accord were to determine that there was an allergic interaction or some sort of contraindication where the use of citric acid was causing headaches, let's say. If Accord receives adverse event reports or even sees medical literature post-approval that begins indicating that, that triggers the duty that Judge Malazzo was concerned with to go back in time and look and say, well, is this something that was already in the pre-approval data or not? And if it's not, in that case, it would certainly be up to Accord to then begin the CBE process to the FDA and say... Because it's their addition, the citric acid, as opposed to what was already there. And that, to me, is what I'm wondering is what 505B2 is really meaning. The new change, not if you're essentially a 505J, Correct. Exactly, Your Honor. Which is adding a little salt or something. Now, that's not to say that if Accord were to receive a heightened spike in adverse event reports or review some of the post-approval literature that appears in the record reporting permanent chemotherapy-induced alopecia connected to docetaxel, that it doesn't just get to ignore it. But that's not our position. But so Hospiro would be in a different situation than you, then? Not with respect to the post-approval literature. With respect to adverse events, yes. But the post-approval literature... I mean, it's important for me to hear you're saying the generics are not getting a free pass here. Exactly, Your Honor. If they get adverse decision, and I understand there's a distinction, I think I understand their argument is those adverse decisions weren't salient or any worse than pre-approval. But additionally, you'd be responsible if there are public studies saying we've reanalyzed the original data, there's a big risk here. You accept that? Yes, Your Honor. And in fact, this is exactly where I think the district court tripped up in its application of newly acquired information. Because the district court said, well, there are post-approval studies that show some incidence of permanent chemotherapy in gestalt patients. So the answer to that, Your Honor, is upon receiving those post-approval literature, a court doesn't ignore that, but rather a court says, all right, that triggers our duty to look back and consider how does that compare to what's out there? And the reality is, if you look at this, and this is undisputed in the record, there are pre-approval instances of chemotherapy-induced alopecia reported in the pre-approval literature. The district court recognized this in its decision. So you're saying, comparing the two literature, it doesn't get worse in the post than the pre? I'm saying that it doesn't get worse, but also, Your Honor, the duty that the district court put... Just in a row because your time's out and I may not be allowed to ask much more questions. But... Ask what you want. But, um, even though there were experts below, I don't really see hard math being done by the district court. And with respect, in the briefs, this is pretty much from page 40 on. So, how do we really know the before-after numbers? You say the incident report showed permanent alopecia at a similar frequency. Is the record, when you say it's undisputed, is it really undisputed here? Or would that be something... So it is undisputed, Your Honor, because this is an analysis that either a police counsel in the trial court level below, or Judge Malazzo even attempted to do in applying the newly acquired information regulation. If I can just continue my answer to that question, what the court did was say, well, there are post-approval incidents and because I don't know what to do with this right of reference issue with the 505B2s, I'll say that's enough to do a duty to revise. The problem with that approach, Your Honors, is that if you go back and begin saying there's a duty to it begins to have a 505B2 act like it's the brand drug in considering the same underlying safety and efficacy issues that the FDA resolved at the time of approval. All right. Thank you. You've reserved time for rebuttal. We will now turn to the other side. Andre Moura for Hickey et al. If I mispronounce your name, I apologize. That was perfect, Your Honor. Thank you. May it please the Court.  I'm not sure whether it's a legal or factual issue. This Court can affirm solely based on the post-2011 information that was available to these defendants. These defendants did not seek approval as generic drugs through the 505J pathway. They sought approval through the 505B2 pathway and that makes all the difference because the changes being affected regulation is available to them. And Merck against Albrecht. We know it's available because they ultimately do it, which is wonderful. Exactly, Your Honor. But is causation somehow not still a question or is the FDA's decision not to reject the new label confirming there is a causation issue? I think it's confirming causation and both defendants before you have not argued that a claim has been established. They're totally focused on the question of whether this was newly acquired information. What about Accord's arguments because that does seem until you get to page 26 it sure does look like the District Court, I mean it explicitly states that they would have a duty to go back and look at the underlying data. They could simply compare. I don't think the Supreme Court, I would look at Wyeth against Levine. I think that's dispositive of their argument as to whether this was newly acquired information. New has to mean new. In other words, unless I'm wrong, it's got to mean post-2011 studies saying there's a worse risk of permanent baldness and that requires you to do the before and after and their argument as I understand it is there's nothing showing a lesser risk before. Their argument is that all this information was provided to the FDA. There wasn't anything new and they try to calculate incidence rates but that's not how Wyeth versus Levine understood newly acquired information. Wyeth versus Levine, there were 20 adverse event reports that had been provided to the FDA. Starting in the 1960s, there was a lot of back and forth between Wyeth, the drug manufacturer and the FDA and in that case, Wyeth argued none of this is new. The FDA had these adverse event reports. We couldn't satisfy the changes being affected regulation and what the Supreme Court said is that's not correct. Right, but they are generics. So in large part, they're piggybacking on Sanofi. No, Your Honor. They're not generics. The defendants are not generics. They're 505B2s. That's why I started there because the generic access to Sanofi's adverse decisions. But that is, it's generic but with a slight change. A slight enough change that the FDA approves it without starting from scratch which is what they do with most. If I created a new drug, we'd have to go through a very long path before it would be approved. That's different from these people and that's why I'm asking if 505B2 is really focused on that switch rather because 505J doesn't really have to do anything different. But if you added X and all of a sudden X starts having an influence that the other drug did not that's when you better start running down the street and getting it out there. I would disagree, Your Honor, in so far as 505B2s are not merely responsible for the changes going forward to their drugs. You gave the example of salt. They're not responsible for their entire drug product and if you look at, we have a very the Woodcock letter has a very long explanation of the 505B2 process and it makes very clear that 505B2 drugs are stand alone new drug applications. They are subject to the exact same requirements as what you would call a brand name drug. For example, if Sanofi's Taxotere were taken off the market, the true generics accepted under 505J would have to be withdrawn automatically. That's what the Woodcock letter talks about. But that would not occur with the 505B2s because they have their own drug and the FDA expects them to update their label. They're responsible for the content in their label. It's true that they rely entirely, in this case there are different ways in which 505B2s can be accepted. They can submit literature showing that the drug is safe and effective. They didn't do that. What they did is they rested entirely on the original new drug application of Sanofi. But going forward, once they're approved. Isn't this whole window that we're in the effort to try to because a lot of drugs are like, you know, $1,000 a month or something and that's a little bit difficult to afford for most people. And sometimes the insurance doesn't cover it and so on and so forth. So the effort is to try to bring that down after the relevant period of time when it's open. And that's what these are about. They are not brand new. They are based on the prior one. There's just like the cord is a very small change. The hospire is a little bit bigger. But they are both cubbied in the original drug. Yes, Your Honor, but under the congressional scheme, they are primarily responsible for the accuracy of their label at all times. So once they were approved and came onto markets, they were fully responsible for their label. They have the same pharmacovigilance obligations as Sanofi. I didn't hear them saying they're not responsible. They're just actually saying there is no data that came to our attention that shows a higher risk than the one before the original baldness warning. Which is wrong because we cited multiple studies. I'm going to do what I always do. Tell me your best study. The one that is most conclusive. And I wrapped into that, is this a frequency, a severity, or a type risk? Or does that not matter? I think it can be all three. We do think it's permanent hair loss was not in the original label. So this is a different type of risk. It's obviously more severe than temporary alopecia. It's a different type. But if the underlying data showed just as much permanent hair loss, and FDA said you know, that's just happening so infrequently, and so many people are surviving cancer, you just have to say alopecia. If they made that determination, why isn't that, unless you show, oh well actually now it's higher in FDA, you would have required more. See my point? It really gets back to the before and after. So I'm asking, I'll get back to my first question. In the record, which study is most conclusive that there is a higher risk? I would point to Kluger. But I think if you look at the years 2011 to 2013, and you count the new reports, there were 31 new reports. I mean that's more than Wyeth in a two year span. I mean that's pretty significant evidence that this information was accumulating. It's pretty significant. So you're saying, including Kluger, say here's what the risk level was, about 7% before the 96 warning, but now the evidence is showing 30% or whatever. Would Denny and him do the before and after? Yes or no? They looked at, they don't have an incidence rate, if that's the question. They do not have an incidence rate. Nor did the underlying experts, right? In this case, the experts never really tried to demarcate, did they? No, Your Honor, because when you're not going to be able to calculate an incidence rate, unless you're doing a clinical trial, because you need to have a lot of information to know the numerator and the denominator. You need to be comparing the same population over the same period of time. But all of this is a question of whether, what would the FDA have done had the defendants proposed a label change? And Albrecht is quite clear that we don't find impossibility preemption just because we consider... I thought that they need the newly discovered first, before they get there. I mean, the problem is, let's say a million ladies take this and one of them loses their hair, you have to report that? I mean, the problem is, this is a difficult area, and I said at the beginning, I'm very, very respectful of both sides of this, because this is a difficult area. But you don't want people to not take a drug that will keep them alive or keep them from having further cancer, just because one lady out there had a bad event. That said, of course, people can make their own decisions, and so if it's happening a lot, they need to know. So, the list, like when you're getting surgery, the list of things that could happen to you, it's very long, and it usually includes you could die. So is nobody ever going to get surgery? Because then they probably will die in a lot of these situations. So it's a difficult area, and I'm wanting to make sure we get it right in terms of what it is that these groups are supposed to do. I agree with that settlement. It's incredibly important for the drug companies that have primary responsibility for their labels to do their job. I mean, both Accord and Hospira have updated their European labels to warn of permanent hair loss. Accord did it 14 days after their U.S. label came to market. I mean, the idea that they didn't know that this was a problem is not borne out by the record. Their answer is the Europeans require more safety disclosures. Even if that were true,  and both the fact that the same companies were saying one thing in Europe versus something else in the United States, when the preemption question is, was the FDA fully informed? It wasn't because these studies weren't being brought to light to the FDA, these new studies, which they had a responsibility to do. They had a responsibility to analyze this data. They could have analyzed solely the post-2011 data and said, look, there are 31 new reports of permanent hair loss. We're concerned. We'd like to warn about it. And then the FDA would have made a determination, and we think the FDA would have made the same determination it made two years later to accept that language. But you only get preemption if you can show that the FDA was fully informed. The FDA did make that determination because the data was the same. 31 studies are basically saying what they knew before, even in 1996. No, Your Honor. The FDA made the determination to update the label in 2015 when it received a single report. That's Sanofi, and they've got adverse incident reports that are scary, but these two defendants don't have access to them. But the fact that Sanofi had more information doesn't mean that these defendants couldn't also have updated the label based on the post-2011 information they had, which was more than the information that Wyeth had in Wyeth v. Levine, where the court said 20 adverse event reports that didn't include incidence rate. This was not new. There had been some permanent before. So if you look at just what's out there in the public, let's go online and look what's out there. The post and the pre, the question is, is the post higher than the pre? It's not, is there anything post? It is new, Your Honor, because it's a greater type. Right? I mean, permanent hair loss. But they had permanent hair loss before. But permanent hair loss is not in the label. No, I understand that, but that's the FDA decision, and so you've got to defer to, I mean, Europe is a very different place in terms of the country pretty much covers most of the sick people pretty fulsomely. That is not particularly our situation. And so they're different countries. They have different rules. You've got to follow their rules. And the FDA did not think it was meaningful enough as of 2011, but they later did. When you get maybe a complaint, and then you start seeing that there's more complaints and so on, maybe that's what persuaded them. But even there, they're still not saying that this causes the permanent hair loss. They're just saying, well, okay, some people have had it. Well, you don't have to establish causation to get a label change. The standard is some basis to believe for the adverse warning section. So that standard, clearly the FDA thought was met. I understand that, but you've got, I mean, this is just a really, really difficult area because I totally respect wanting to stay alive, wanting to not get cancer again, but I also respect not wanting to lose your hair forever. And that's just a really difficult arena. It's, so, what is your, let me ask you this. If you were writing our opinion, I think you would agree that if there were a million women that took this, or women and men, but a million people, let's just say, who took this drug, and only one of them lost their hair permanently, probably that doesn't need to be revealed. What is your level? At what point? What would we need to say? Because the argument is that we're in a race-nova world, so what we say is going to matter. What should we say? Your Honor, I would start with Albrecht, which sets forth a test for preemption that, where the court says impossibility preemption is a demanding defense for any drug manufacturer that has the changes being effective regulation available to it. It has to show two things, that the FDA took action to prevent the drug manufacturer from giving the warning that state law would require. That didn't happen here, because there was never an ask, there was never an FDA action where the FDA said you cannot provide this warning, and that was key. I mean, Justice Thomas' concurrence is very clear that we do not find impossibility preemption just based on the hypothetical of what would the FDA have done. So, do we know exactly what the FDA would have done? I think we have a very good indication, because two years later, the FDA accepted this label change. But, their defense is impossibility preemption, and they cannot establish that demanding defense simply by arguing that the FDA might have made a different decision. I've been pronouncing Sanofi. Sanofi had a unique data set of adverse incidents, and pretty much as soon as they said we see a problem here, at least a court jumped in and said, fine, change our label too. The fact that there was more information in the hands of Sanofi does not mean that the information available in these reports was insufficient to establish for them to invoke the changes being effected. The court didn't get any reports of their own drug, and if you look at the post, the post, let's argue for the moment, let's just assume the post isn't more than the pre. Why, then, would they need to do anything? That's the part that I'm finding hard to understand. I don't think it's correct that the defendants didn't have any reports. The Accord didn't. The Hospiro did. That's my understanding of and you didn't say differently on that. Well, I'm not sure that's correct, because the 10-year follow-up data from Sanofi, I mean, that's what the I'm saying that Accord's own drugs were not reported back to them that people are getting that. I'm not saying they couldn't read the public stuff. I'm saying their own, whereas Hospiro did get some information. But I don't see why that would matter, Your Honor, when they based their drug entirely on Sanofi's NDA. I mean, they're both trying to have it both ways. That's more of a 505J. You're saying they're a 505B2. Correct. But they didn't get notice, but they should nevertheless do this. It's a little bit hard for me to understand, because the problem is whatever ruling we make is going to be meaningful for a lot of other situations. So I want to be sure that it's, well, I always want to be sure it's correct, but here it is a very complex situation. So I just want to be sure I'm understanding what you're saying on that. Let me point, Your Honor, to the definition of newly acquired information, because it's not limited to adverse event reports that a single company might have obtained. It's data analysis or other information not previously submitted to the agency, which may include, but is not limited to data derived from new clinical studies, reports, or adverse events, or new analysis of previously submitted data. If the studies reveal risks of a different type, greater severity, or frequency, and we have greater severity, and we arguably have greater frequency, and you just have to apply what... What is newly acquired evidence? Do you accept the Fourth Circuit night decision, too? In what regard, Your Honor? Well, as to the burden shifting analysis and what is... Because I know state highest courts have been wrestling with impossibility preemption, too. Well, I guess the question is what's your best case, if we were writing this decision and interpreting this, what's the best case you'd point us to? The best case is Evans against Gilead was a case from the District of Hawaii. It was a case involving Truvada, another drug, and they... The court... Yes. Yes. But I honestly think Wyeth versus Levine and Merck are the best cases, yes. Can you articulate any problems with the Fourth Circuit night decision? I didn't see you in your brief say there were. Well, it's not really a problem here because we identified... We identified studies post-11. I think in a lot of these cases the litigants just don't identify anything, and so the burden shifting matters. So if the litigation is seeking guidance, let's say you don't get everything you want, let's say they prevail, what's the limiting language? Obviously there are many ways to slice this in terms of giving guidance for the MDL that's pending. Yes. If the burden was for us to come forth with evidence, we have come forth with evidence post-2011 that establishes that a label change could have been put in place. There was newly acquired information that the risk was higher than the one pre-2011? Correct. Correct, Your Honor. The Lugar study is the strongest one. Not only that the risk was higher, but that there was a risk of greater severity and type. I mean, this risk was not in the label. Permanent hair loss was not in the label. The FDA was not... The district court found that the FDA was not clued in to this until 2015. So what would the FDA had done? Had these defendants gone to the FDA and said, we would like to update the label based on these studies which show 31 additional reports of taxitier... How many had they given their drug to? It was 160,000 or something, correct? I don't think it matters because if you look at Why v. Labine, there were only 20 reports. And so if you look at the... That's not how the court understood newly acquired information. And what was important to the court there and in Albrecht was the CBE regulation is available. So when you're asking the question of is this impossible for the defendant to take an action, it has to be both doctrinally and practically because the federal regulation or a federal action prohibited the defendants from taking some action that state law would require. Thank you, Your Honor. Thank you. I appreciate your argument. I think I could probably spend all day with this, but we don't have that. Thank you, Your Honor. Alright, we'll hear the rebuttals starting with Hospiro. With more for Hospiro. Why was it impossible? Because it didn't meet the regulation. We can't change the label if it doesn't meet the regulation. And just to point to page 26 of the district court's order, the key to that was the district court went straight to the causal standard on page 26. It skipped over the greater frequency standard. And that's the point. The court doubled down on that in footnote 84 when it quoted the federal register. Where's the best record statement of what the frequency of permanent hair loss was before FDA approved the 96 label saying just allocation? How do you know what that number is? So there are many different studies, but the two best ones are the Nabholt study, and that's in 5835 of the record, 7.4 percent, and the Sedlicek study. I thought it was around 7 percent. And that's 5844. Both of those Around 7 percent too? 6.3 percent. Right. And Apelli's council said their best study was the Kluger study. 2 percent. 2 percent. That's less than 7 percent. That's less than 6 percent. So their best study by their very admission Am I right? I wish the district court had done it this clearly if this is the way to do it. Right, but the district court of course was not applying the correct analysis. The district court wasn't doing any The district court went right to the causal standard, which we're not talking about here. It skipped over the greater frequency. That's the key point here. And that's what the plaintiff's council is doing as well. The plaintiff's council keeps talking about there's 30 more cases. Well that's great. Cases are always going to be more cases when you have a drug on the market. That says nothing about the frequency. I have a question. Sanofi, they get the CBE approved new more strict warning in December of 2015. Correct. You wait about 15 months. Correct. Does the record tell us why? It's not in this record, but it got tied up with another labeling change. That's one reason. The second reason is we did our own analysis, looked back at the data, looked at the Sanofi's data, and that just took some time, but eventually we did make it. And you think it's irrelevant because the person suing you all already had taken the drug. Absolutely. Prior to this whole process. Is that the end date when they take it or when they're prescribed it? Which is the end date? The better end date is when they finish taking it. Because it's a causation question. They have to show that a different label would have changed the prescription and would have prevented the plaintiff from getting permanent. When did she stop taking it? February of 2014. I don't think it's pertinent here. There was nothing before that time period. What about the Hawaii case? Are you familiar with it? The Hawaii case that he said was his best... That doesn't say anything about the question here, which is greater severity or frequency. It just doesn't address it. It's just a garden variety preemption case that really doesn't... None of their cases support the proposition that they're saying, but this is, including that case or Wyeth... On the two-step approach, how would that work? The two-step approach is in Albrecht. The first step is what we're talking about here, which is whether there was newly acquired information. That's the issue in this case, and there was not. There is a second step to the analysis, which is that if there were newly acquired information, is there clear evidence the FDA would have rejected a proposed labeling change? You say that's not in front of us because you think you win on the first step. Okay. Thank you. You've used your time for rebuttal. We'll now hear from... Okay. We'll hear from Ruttinger for Ackerd. Thank you, Your Honor. Judge Haynes, I'd like to answer your question. Let's talk about where the impossibility is here. Understand what it is that plaintiffs want state law to have done. According to Apple Leafs, Ackerd and Hospira should have made the exact same label revision that Sanofi did in December 2015, but that they should have done it as early as 2011. Let's be clear about what Sanofi based its label revision on. It was working with the FDA, looking back at 20 years of Sanofi's own data, not only its clinical trial data, but thousands of adverse event reports. It is undisputed that due to the right of reference provisions built into Section B-2, Ackerd did not have that data. It was not possible for Ackerd or Hospira to have done the same analysis that led to the Sanofi label change. I do want to address, Your Honors, briefly... You keep coming back to that. Where would I find the clearest discussion of this right of reference? The clearest discussion of the right of reference, Your Honor, there's not case law on this. That's part of the unique issue with this being B-2. In our appellant's brief and reply brief, we discussed the framework, but also the right of reference is built into B-2, which I think is 355 B-2 as well. Correct. Exactly. We do not have access to that data to have done it to begin with. That's why the baseline for when a 505 B-2 applies the newly acquired information regulation, the baseline must be the time of approval, and the comparison must be to the scientific and medical literature that was publicly available at that time. I know Mr. Mura suggested that Accord and other 505 B-2s should look back at the pre-approval data independently. If we do that, we are second-guessing the determination made by the FDA and reconfirmed at the time of that B-2 drug's approval, and doing that violates the principle that Accord's label is adequate as a matter of law at the time of approval. Okay. Thank you. All right. This case is now under submission. We appreciate both sides, and we're going to take a short break for about 10 minutes. Thank you.